1

2

3

4

5              UNITED STATES DISTRICT COURT

6              EASTERN DISTRICT OF CALIFORNIA

7

8  | **ISIAH MURRIETTA-GOLDING deceased** | **CASE NO. 1:18-CV-0314 AWI SKO** |
| --- | --- |

**through his successor in interest Christina**

9  **Lopez, et al.,**

**ORDER ON DEFENDANT'S MOTION**
10              **Plaintiffs**        **FOR SUMMARY JUDGMENT**

11         **v.**

(Doc. No. 48)
12  **CITY OF FRESNO, CITY OF FRESNO**
**POLICE CHIEF JERRY DYER, FRESNO**
13  **POLICE SGT. RAY VILLALVAZO, and**
**Does 1-10,**
14
              **Defendants**
15

16

17         This case arises from a fatal encounter between decedent Isiah Murrietta-Golding

18  ("Murrietta-Golding" or "Isiah") and members of the City of Fresno ("the City") Police

19  Department.  Plaintiffs Christina Lopez and Anthony Golding, both individually and purporting to

20  be successors in interest to Murrietta-Golding, bring claims under 42 U.S.C. § 1983 for violations

21  of the First, Fourth, and Fourteenth Amendments, and state law claims for California Civil Code §

22  52.1, negligence, and assault and battery.  Currently before the Court is Defendants' motion for

23  summary judgment.  For the reasons that follow, the motion will be denied.

24

25              **SUMMARY JUDGMENT FRAMEWORK**

26         Summary judgment is proper when it is demonstrated that there exists no genuine issue as

27  to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R.

28

1  Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-
2  Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears
3  the initial burden of informing the court of the basis for its motion and of identifying the portions
4  of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine
5  issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty
6  Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome
7  of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49
8  (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009).  A dispute is "genuine" as to
9  a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-
10  moving party.  Anderson, 477 U.S. at 248; Freecycle Sunnyvale v. Freecycle Network, 626 F.3d
11  509, 514 (9th Cir. 2010).

12        Where the moving party will have the burden of proof on an issue at trial, the movant must
13  affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.
14  Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an
15  issue at trial, the movant may prevail by presenting evidence that negates an essential element of
16  the non-moving party's claim or by merely pointing out that there is an absence of evidence to
17  support an essential element of the non-moving party's claim.  See James River Ins. Co. v. Herbert
18  Schenk, P.C., 523 F.3d 915, 923 (9th Cir. 2008); Soremekun, 509 F.3d at 984.  If a moving party
19  fails to carry its burden of production, then "the non-moving party has no obligation to produce
20  anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan
21  Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If the moving party
22  meets its initial burden, the burden then shifts to the opposing party to establish that a genuine
23  issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio
24  Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103.  The opposing party cannot "'rest
25  upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets
26  forth specific facts showing that there is a genuine issue for trial.'"  Estate of Tucker v. Interscope
27  Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

28        The opposing party's evidence is to be believed, and all justifiable inferences that may be

1  drawn from the facts placed before the court must be drawn in favor of the opposing party.  See

2  Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Narayan v. EGL, Inc., 616 F.3d 895, 899

3  (9th Cir. 2010).  While a "justifiable inference" need not be the most likely or the most persuasive

4  inference, a "justifiable inference" must still be rational or reasonable.  See Narayan, 616 F.3d at

5  899.  Summary judgment may not be granted "where divergent ultimate inferences may

6  reasonably be drawn from the undisputed facts."  Fresno Motors, LLC v. Mercedes Benz USA,

7  LLC, 771 F.3d 1119, 1125 (9th Cir. 2015).  Inferences are not drawn out of the air, and it is the

8  opposing party's obligation to produce a factual predicate from which the inference may be drawn.

9  See Fitzgerald v. El Dorado Cnty., 94 F.Supp.3d 1155, 1163 (E.D. Cal. 2015); Sanders v. City of

10  Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008).  "A genuine issue of material fact does not

11  spring into being simply because a litigant claims that one exists or promises to produce

12  admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002);

13  see Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  The parties

14  have the obligation to particularly identify material facts, and the court is not required to scour the

15  record in search of a genuine disputed material fact.  Simmons v. Navajo Cnty., 609 F.3d 1011,

16  1017 (9th Cir. 2010).  Further, a "motion for summary judgment may not be defeated . . . by

17  evidence that is 'merely colorable' or 'is not significantly probative.'"  Anderson, 477 U.S. at 249-

18  50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  If the nonmoving party

19  fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is

20  entitled to summary judgment.  Nissan Fire, 210 F.3d at 1103.

22  **FACTUAL BACKGROUND[1]**

23  On April 14, 2017, an individual was murdered in Fresno, California.  See DUMF 1.  A car

24  had been fired upon by a handgun and the car had crashed into the center median.  See PUMF's 1,

---

[1] The parties submitted their individual disputed facts as part of a "joint statement of undisputed facts."  See Doc. No 48-2.  This was not actually a statement of joint facts that are undisputed, rather, they were each parties' separate facts and responses thereto.  Therefore, each parties' separate facts are found within Doc. No. 48-2.  "DUMF" refers to Defendants' Undisputed Material Fact, and "PUMF" refers to Plaintiffs' Undisputed Material Fact.  Plaintiffs have submitted many facts that are unnecessary to the resolution of this motion.  Those unnecessary facts have been reviewed but have been omitted from this order.

3; Ryan Expert Report ¶ 89.  The driver was killed.  See Ryan Expert Report ¶ 89.  One individual who had been a surviving occupant of the car told Fresno Detective Mark Yee that Israel Murrietta had done the shooting and his little brother Isiah was with him, and that the shooting was part of an on-going feud, "rival gang stuff."  Yee Depo. 15:9-16; Ryan Expert Report ¶ 90; see also PUMF 1.  Yee also had viewed a surveillance video from a local smoke shop that showed the two brothers handling a firearm before the shooting.  See PUMF 1.  Specifically, the video purports to show Israel handling a gun wrapped in a shirt, then handing it to Isiah, who then handed it back to Israel.  See PUMF 2.  Yee believed that Israel and Isiah were the suspects for the murder.  See Yee Depo. at 26:3-9.

Yee devised a plan that included the City's Special Response Team ("SRT"), led by Sgt. Hoagland, and the Street Violence Bureau's Tactical Team ("SVBTT"), let by acting Det. Williams who was filling in for Defendant Sgt. Ray Villalvazo ("Villalvazo").  See PUMF 4.  The SVBTT would surveil the brothers' home in an effort to obtain a search warrant.  See id.  If either Israel or Isiah left the home, the SRT apprehension team would conduct a stop and detain either or both of the brothers for questioning.  See PUMF 5.  The primary goal of Det. Yee was to detain the brothers, conduct a search of their home pursuant to a warrant, and obtain current photos of the brothers to show to witnesses.  See PUMF 7.  Officers (presumably members of the SRT and the SVBTT) were briefed that Israel was likely the shooter.  See PUMF 8.  Officers also understood that Isiah was on probation for a misdemeanor violation and was arrestable for a probation violation.  See Gonzalez Depo. 12:1-18.  It appears that the officers were briefed that Israel and Isiah were not arrestable for the murder of the car driver.  See id. at 12:19-13:21.

Villalvazo was returning home from an out of town trip when he was informed by Det. Williams about the investigation and operations involving Israel and Isiah.  See PUMF 12. Villalvazo missed the verbal briefing about the operation.  PUMF 13.  However, upon his return to Fresno, Villalvazo obtained a briefing packet that had been left in his office and he left to join the operation as the SVBTT supervisor.  See PUMF 14.  The briefing packet included photos of the brothers, their ages (including Isiah's age of 16), still photos of the brothers from the smoke shop surveillance video (with one of the brothers possibly holding a gun), an aerial photo of the

1  brothers' home, the brothers' arrest history, a handwritten notation that Israel was the shooter, a
2  Calwa bulldog member, and not on probation, and a handwritten notation that Isiah was on
3  probation.  See DUMF's 3, 4; PUMF 15; Allen Dec. Ex. K.  Villalvazo reviewed the briefing
4  packet.  See Villalvazo Depo. at 64:3-4.

5       Villalvazo arrived on scene with his unit and later took up the position of an SVBTT
6  member who had to leave due to illness.  See id. at 64:10-14.  Villalvazo then called Det. Yee,
7  who gave Villalvazo a briefing of the homicide investigation.  See id. at 64:14-18.  Yee told
8  Villalvazo that there was a homicide the previous day, "the two brothers had been identified as
9  being involved in the homicide," there was a store video that depicted both brothers with a firearm
10 and walking out of the store with the firearm wrapped up, a witness had identified the brothers at
11 the scene, the brothers were the suspects, and "[t]hey were both responsible for the murders."  See
12 id. at 65:5-16.  Yee did not tell Villalvazo that Israel was the shooter.  See id. at 65:17-22.  Yee
13 also told Villalvazo that Calwa gang members committed the crime.  See id. at 69:12-15.

14      Villalvazo then spoke with Sgt. Hoagland to understand the overall tactical plan and the
15 responsibilities of the SRT and the SVBTT.  See id. at 65:25-66:3; see also PUMF 17.  Hoagland
16 explained that the SVBTT's role was to conduct surveillance and that the SRT would make any
17 stops of the brothers.  See PUMF 20.

18      During surveillance of the brothers' house, a car pulled into the brothers' home and the
19 passenger resembled one of the brothers.  See PUMF 21.  An officer from the SVBTT drove past
20 the car in an unsuccessful attempt to identify the passenger.  See PUMF 22.  Villalvazo also drove
21 by the car and recognized the passenger as one of the brothers.  Se PUMF 23.  The passenger was
22 seen exiting the car, entering the home, and returning to the car before the car left the brothers'
23 home.  See PUMF 26.  The passenger had not been positively identified as either Isiah or Israel.
24 See PUMF 27.  Villalvazo briefly followed the car as SRT's marked cars got behind the car to
25 make the pre-planned high risk stop.  See PUMF 28.  Villalvazo parked nearby to observe the
26 stop.  See PUMF 29.

27      The SRT members conducting the stop consisted of Sgt. Hoagland, Det. Gonzalez, and
28 Officer Gueringer.  See PUMF 30.  These offices pulled the car over for a traffic stop and called

1  the front passenger out of the car.  See id.  When the front passenger exited, Sgt. Hoagland

2  recognized him as Isiah, but did not alert any other officer, including Villalvazo, that the passenger

3  was Isiah.  See PUMF 31.  The officers instructed Isiah to walk backwards toward them.  See

4  PUMF 32.  Isiah initially complied, but then took off running.  See id.; see also DUMF 5.  As he

5  ran, Isiah held his right hand on his right hip.  See DUMF 6.  A video from Gonzalez's body-cam

6  indicates that as Isiah began to run, his right hand was grabbing at his side waistband.  See Allen

7  Ex. N; PUMF 33.  The video shows that Isiah's pants are very baggy, and his red underwear was

8  showing.  See Ex. N.  Villalvazo testified that Isiah's right hand was holding his right hip area, but

9  Villalvazo could not tell whether Isiah was gripping his pants.  See Villalvazo Depo. 89:9-16.

10  Although Villalvazo agreed that Isiah could have been holding up his pants, based on how people

11  usually flee while holding their pants, i.e. holding their pants in the front instead of holding the hip

12  area, and based on Det. Yee's statements about the videos showing the brothers with a gun on the

13  previous day, Villalvazo believed that Isiah was holding a gun on his right hip.  See Villalvazo

14  Depo. 85:1-86:23.  Three eyewitnesses told investigating officers that, as Isiah ran, he was holding

15  or appeared to be holding up his pants with his right hand.  See Allen Ex. O.  No witnesses,

16  including Villalvazo, saw anything in Isiah's hands.  See PUMF 35.

17         As Isiah ran, Det. Gonzalez chased on foot to maintain visual contact while Sgt. Hoagland

18  radioed to the other members of the SRT the direction of flight.  See PUMF 36.  Remaining

19  members of the SRT would begin setting up a perimeter to initiate the common practice of "chase

20  to contain."  See id.  Villalvazo heard radio reports concerning Isiah's movement and drove his car

21  in reaction to the reports and his own visual observations of Isiah.  See Villalvazo Depo. 89:17-

22  92:24.  Villalvazo saw Isiah running towards a daycare center.  PUMF 47.

23         Villalvazo parked his car, got out, and at the same time, observed Isiah running up to a six

24  foot high fence into the yard surrounding the daycare center.  PUMF 49.  Villalvazo ran up

25  towards the fence area.  See Villalvazo Depo. 93:8-10.  As he ran up towards the fence, Villalvazo

26  testified that he yelled (one time for sure), "Police, stop!"  Id. at 93:16-24; see also DUMF 7.

27  However, one officer (DeLuca) who was in the area did not recall hearing Villalvazo say anything.

28  See DeLuca Depo. 45:9-11.  Isiah got over the fence and into the yard as Villalvazo was running

1  to the fence.  <u>See</u> Villalvazo Depo. 93:9-10.  Villalvazo pursued Isiah to the fence, but he did not

2  jump over it.  <u>See</u> PUMF 50.  Villalvazo did not issue any radio calls to inform other officers or

3  the SRT about his involvement in the chase.  <u>See</u> PUMF 51; Villalvazo Depo. 123:15-124:8.

4  Once over the fence, Isiah glanced back at Villalvazo.  PUMF 58.  That is, Isiah looked

5  over his right shoulder at Villalvazo.  DUMF 8.  In response to Isiah glancing/looking at

6  Villalvazo, Villalvazo drew his gun as he (Villalvazo) was still running up to the fence.  <u>See</u>

7  PUMF 59.  Isiah ran a few steps in the daycare yard.  <u>See</u> PUMF 61.  Villalvazo contends that

8  Isiah looked back at Villalvazo and then made a movement to his left side as if he (Isiah) were

9  drawing a gun.  <u>See</u> PUMF 62.  Isiah looking back and making a gun draw motion with his left is

10  characterized by Villalvazo as Isiah making a "target lock" on Villalvazo.  <u>See</u> Villalvazo Depo.

11  97:19-20.  In response to Isiah's movements, Villalvazo discharged his weapon and shot Isiah.

12  <u>See</u> <u>id.</u> at 97:7-10.  Villalvazo testified that he shot Isiah because Isiah's actions put him at

13  imminent risk, and the public, and Isiah was going for the daycare center.  <u>See</u> <u>id.</u> at 97:11-20.

14  Villalvazo had been concerned about Isiah holding a gun in his right hand, but there was a period

15  of time (the exact duration is unknown) in which Villalvazo lost sight of Isiah.  <u>See</u> <u>id.</u> at 96:3-24.

16  Villalvazo believed that it was probable and reasonable that Isiah had moved the gun from his

17  right hand to his left during the period of time that Villalvazo had lost sight of him.  <u>See</u> <u>id.</u>

18  Villalvazo did not issue a warning that he would shoot before firing his weapon, rather, he had

19  told Isiah to stop at a time before he had drawn his service gun.  <u>See</u> <u>id.</u> at 125:2-9.  Villalvazo

20  testified that he did not warn Isiah that he would shoot because it was not feasible to do so.  <u>See</u> <u>id.</u>

21  Immediately after Villalvazo fired his weapon, Isiah fell to the ground.  <u>See</u> Allen Dec. Ex. A.

22  Officer DeLuca jumped over the fence shortly thereafter and determined that Isiah did not

23  have a gun.  <u>See</u> PUMF 84.  DeLuca handcuffed Isiah and turned him over on his back.  <u>See</u>

24  PUMF 95.  Isiah moaned, cried, and screamed for four minutes before he lost consciousness.  <u>See</u>

25  <u>id.</u>  Isiah never regained consciousness and died three days later in a hospital.  <u>See</u> <u>id.</u>

26  A video camera from the daycare recorded Isiah jumping over the fence, Villalvazo

27  appearing in front of the fence, and the actual shooting of Isiah.  <u>See</u> Allen Dec. Ex. A.  The video

28  shows Isiah scaling the metal fence and flipping over the top of the fence.  <u>See</u> <u>id.</u>  As he flipped

over the fence, Isiah's hat fell off his head and his red underwear is visible.  See id.  Once he

landed on the ground, Isiah picked up his hat with his right hand.  See id.  Isiah then began to run

again.  See id.  Isiah is wearing baggy loose fitting pants.  See id.  As Isiah began to run, he looked

over his right shoulder.  See id.  Villalvazo then comes into view at the far left corner of the fence

(the corner is made up of the metal fencing and a cement wall) where Isiah had been looking.  See

id.  As Isiah began to look away from Villalvazo and forward into the daycare's yard, Isiah made a

movement with his left arm, bending it at the elbow in an upward motion.  See id.  Isiah then

continued to run forward with his head facing forward.  See id. Isiah's left hand went back down.

See id.  It appears that Isiah is holding his pants at the left hip area with his left hand as he is

running.  See id.  DeLuca is then seen exiting an unmarked car and running towards the fence.

See id.  Isiah ran four or five steps forward.  See id.  Isiah did not look at Villalvazo as he ran.  See

id.  Around the fourth or fifth step, Isiah again brought his left hand up his left side, bent at the

elbow, but again appears to be holding his left hip area with his left hand.  See id.  Isiah did not

turn towards Villalvazo and his left hand appears to be going back down.  See id.  At the fourth or

fifth step around the time that his hand appears to just start going back down, Villalvazo fired his

weapon, and Isiah went down.  See id.  DeLuca was scaling the fence and was about to flip over

into the daycare yard when Villalvazo fired his weapon.  See id.  The video ends at that point.

From the time that Isiah went over the fence and his feet hit the ground to the time that Villalvazo

fired his weapon, approximately 4 seconds expired.  See id.  From the time that Villalvazo

appears on the video to the time he fires his weapon, approximately 2 seconds expired.  See id.

**DEFENDANTS' MOTION**

**I.      Fourth Amendment Claim**

*Defendants' Argument*

Defendants argue that Villalvazo's use of force was objectively reasonable.  Villalvazo

knew that Calwa Bulldog gang members Isiah and Israel had been positively identified as having

committed the murder on April 14.  Surveillance video from the day of the murder confirmed that

Isiah had been in possession of the handgun used in the murder, both before and after it had been

used in the murder.  Isiah initially feigned cooperation during the stop and then suddenly fled on foot while continuously holding his right hand against his right hip as if holding a weapon in place.  Despite clear warnings from numerous officers to stop, Isiah continued to flee.  He fled into a nearby daycare which officers believed to be open and potentially occupied by children and staff.  Although Villalvazo yelled through the fence, "stop, police," Isiah continued running as he very clearly looked back at Villalvazo.  Villalvazo perceived that Isiah was obtaining a "target lock" in preparation to fire the same handgun that had been used in the murder less than 24 hours prior.  When Isiah then distinctly gestured toward his left hip as if reaching for a handgun, Villalvazo made the split-second decision to fire a single shot due to the reasonable belief that Isiah (1) was an immediate threat to him and (2) to prevent a murder suspect, believed to be armed, from reaching innocent civilians potentially occupying the daycare center.  The totality of these circumstances, when combined with the allowance that must be given to officers who are forced to make split second judgments under tense, uncertain, and rapidly evolving situations, Villalvazo's fear of imminent threat was reasonable and his single shot was a reasonable amount of force.

> *Plaintiffs' Opposition*[2]

Plaintiffs argue that the evidence shows that Villalvazo violated Murrietta-Golding's Fourth Amendment rights.  Isiah never posed an immediate threat of death or serious bodily injury to Villalvazo or others.  Villalvazo claimed that Isiah posed an imminent threat of harm, even though the standard is immediate threat of harm.  Isiah did not have a gun and thus, had no reason to reach towards his pants in a manner suggestive of having a gun.  Isiah never drew a gun, he continued running before a shot was fired, and he never looked at Villalvazo a second time.  Isiah was running away from Villalvazo and running straight towards another wall at the other end of the daycare center, not towards the daycare itself.  Although Villalvazo uses the phrase "target lock," it is clear that Isiah's momentary glance at Villalvazo was not a "target lock" as that term is understood by law enforcement.  There was no reason to believe that Isiah had a gun, and

---

[2] Plaintiffs Christina Lopez and Anthony Golding are represented by separate counsel and filed separate oppositions. However, the arguments made by both Plaintiffs are very similar, though not identical.  Unless otherwise noted in this order, the Court will view the positions and arguments of the two Plaintiffs as a unified opposition.

1  Villalvazo did not know for sure whether the person he shot was even one of the Murrietta
2  brothers.  Moreover, although a warning that deadly force would be used was feasible, Villalvazo
3  gave no warning before he fired.  Further, Isiah was not wanted for homicide, he was only wanted
4  for a non-violent probation offense and fleeing from the police, which are misdemeanors.  Finally,
5  there were less intrusive options available to apprehending Isiah.  Villalvazo could have followed
6  the plan and let SRT apprehend Isiah using the "chase to contain" tactic, or he could have given
7  Isiah a warning that force would be used, or he could have let Isiah go, or he could have moved to
8  the side of the cement wall if he was worried that Isiah was attempting to pull a gun.  Under the
9  totality of the circumstances, Isiah posed no immediate threat and the use of deadly force was
10  unreasonable.[3]

11  *Legal Standards*

12     1.     Fourth Amendment Excessive Force

13       All claims that law enforcement officers used excessive force, either deadly or non-deadly,
14  in the course of an arrest, investigatory stop, or other seizure of a citizen are to be analyzed under
15  the Fourth Amendment and its standard of objective reasonableness.  See Scott v. Harris, 550 U.S.
16  372, 381-83 (2007); Graham v. Connor, 490 U.S. 386, 395 (1989).  Cases that involve deadly
17  force do not fit into their own separate category with their own set of "rigid pre-conditions" that
18  must be met, rather the key is whether the officer's actions were reasonable.  See Scott, 550 U.S.
19  at 382-83; Hooper v. County of San Diego, 629 F.3d 1127, 1133 (9th Cir. 2011).  The pertinent
20  question in excessive force cases is whether the use of force was "objectively reasonable in light
21  of the facts and circumstances confronting [the officers], without regard to their underlying intent
22  or motivation."  Graham, 490 U.S. at 397; Hooper, 629 F.3d at 1133.  The objective inquiry into
23  reasonableness is highly fact specific.  See Scott, 550 U.S. at 383; Wilkinson v. Torres, 610 F.3d
24  546, 551 (9th Cir. 2010).  "We first assess the quantum of force used to arrest [the plaintiff]" and
25  then "measure the governmental interests at stake by evaluating a range of factors."  Davis v. City
26  of Las Vegas, 478 F.3d 1048, 1054 (9th Cir. 2007).  Factors that are considered in assessing the

27
28  [3] There are additional points made by Plaintiffs' in their opposition.  However, because those points will not change the result of this motion, the Court will not address them.

10

government interests at stake include, but are not limited to, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396; Luchtel v. Hagemann, 623 F.3d 975, 980 (9th Cir. 2010); Davis, 478 F.3d at 1054. Where it is or should be apparent that an individual is emotionally or mentally unstable, that is a factor that must be considered in determining the reasonableness of the force employed. See Luchtel, 623 F.3d at 980; Drummund v. City of Anaheim, 343 F.3d 1052, 1058 (9th Cir. 2003). Courts also are to consider whether it was feasible to give a warning before using force, and whether a warning was actually given. See Bryan v. MacPherson, 630 F.3d 805, 831 (9th Cir. 2010). "In some cases . . . the availability of alternative methods of capturing or subduing a suspect may be a factor to consider." Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005); see Luchtel, 623 F.3d at 980. "[P]olice are required to consider what other tactics if any were available, and if there were clear, reasonable, and less intrusive alternatives to the force employed that militate against finding the use of force reasonable." Nehad v. Browder, 929 F.3d 1125, 1138 (9th Cir. 2019) (internal quotations omitted). However, police officers "are not required to use the least intrusive degree of force possible" as long as the force actually used was reasonable. Forrester v. City of San Diego, 25 F.3d 804, 807 (9th Cir. 1994); see Gregory v. County of Maui, 523 F.3d 1103, 1107 (9th Cir. 2008). That is, a reasonable use of force "encompasses a range of conduct, and the availability of a less-intrusive alternative will not render conduct unreasonable." Wilkinson, 610 F.3d at 551. It may also be appropriate to consider the parties' "'relative culpability,' i.e. which party created the dangerous situation and which party is more innocent, may also be considered." Espinosa v. City & County of San Francisco, 598 F.3d 528, 537 (9th Cir. 2010); see Scott, 550 U.S. at 384. Finally, in some cases, it may be appropriate to consider whether the officer failed to identify himself as a law enforcement officer. See Nehad, 929 F.3d at 1138. Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396; Wilkinson, 610 F.3d at 550. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about

the amount of force that is necessary in a particular situation." <u>Graham</u>, 490 U.S. at 396-97; <u>Wilkinson</u>, 610 F.3d at 550. "Force is excessive when it is greater than is reasonable under the circumstances." <u>Santos v. Gates</u>, 287 F.3d 846, 854 (9th Cir. 2002).

<u>Discussion[4]</u>

As indicated above, the Court examines a number of considerations, both as recognized by case law or as may be relevant to a particular case, to determine if the force used by Villalvazo was reasonable under the totality of the circumstances. See <u>Mattos v. Agarano</u>, 661 F.3d 433, 441 (9th Cir. 2011).

1.    Quantum of Force

The quantum of force at issue was a single shot from Villalvazo's service pistol. This is a very high quantum of force, it is deadly force. See <u>Blanford v. Sacramento Cnty</u>, 406 F.3d 1110, 1115 n.9 (9th Cir. 2005). The use of deadly force implicates that highest level of Fourth Amendment interests. See <u>Vos v. City of Newport Beach</u>, 892 F.3d 1024, 1031 (9th Cir. 2018). "An officer's use of deadly force is reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." <u>Gonzalez v. City of Anaheim</u>, 747 F.3d 789, 793 (9th Cir. 2014); <u>see</u> <u>Tennessee v. Garner</u>, 471 U.S. 1, 11-12 (1985); <u>see also</u> <u>Nehad</u>, 929 F.3d at 1132-33.

2.    Government Interest

a.    Severity of the Crime

As Murrietta-Golding was running, he was clearly violating Penal Code § 148(a)(1), which prohibits willfully obstructing or delaying a peace officer in the discharge of his duties; this is a misdemeanor. See <u>Cal. Pen. Code</u> §§ 17(b), 148(a)(1); <u>Young v. County of L.A.</u>, 655 F.3d 1156, 1164 (9th Cir. 2012). Violations of § 148 "will tend to justify force in far fewer circumstances than more serious offenses, such as violent felonies." <u>Young</u>, 655 F.3d at 1165. The non-violent

---

[4] The Court notes that the opposition of Plaintiff Anthony Golding cites to television programs and news stories, both locally and nationally, that addressed and offered opinions about the shooting of Murrietta-Golding. The views expressed in these "articles" are irrelevant, unduly prejudicial, improperly inflammatory, unhelpful, and hearsay. <u>See</u> Fed. Rs. Evid. 403, 701(b), 801(c), 802. Golding's quotations from and citations to these "articles" is improper. The Court has not considered these "articles" in any way in resolving this motion. During trial, and in any further submissions to the Court, no party shall make reference to these (or other similar) "articles'" existence or specific content. The "articles" are hereby excluded from all further proceedings in this case. <u>See</u> <u>id.</u>

12

1  violation of § 148(a)(1) "will not, without more, give rise to a significant governmental interest in
2  the use of significant force." Id.

3       In addition to § 148, Murrietta-Golding was subject to arrest for a probation violation
4  involving a misdemeanor.  See Gonzalez Depo. 12:2-18.  The nature of the violation has not been
5  disclosed to the Court.  In the absence of additional evidence, the Court will assume that the
6  violation was non-violent in nature.  So assuming, the Court concludes that the probation violation
7  is comparable to the § 148 offense and does not give rise to a significant governmental interest in
8  the use of significant force. Cf. id.

9       Villalvazo's briefing notes that Isiah was a murder suspect.  However, the officers were
10  attempting to detain Isiah for the purposes of questioning, obtaining a current photograph, and
11  possibly arresting him on the misdemeanor probation violation.  An excessive force analysis is to
12  consider "the facts known to the police at the time of the arrest with respect to the alleged offense
13  that triggered the arrest." Velazquez v. City of Long Beach, 793 F.3d 1010, 1026 (9th Cir. 2015).
14  Because there is an insufficient indication that the attempted arrest/detention of Isiah was based on
15  any murder related Penal Code violation, the severity of the crimes at issue were low as they
16  involved non-violent misdemeanors.

17       Nevertheless, "determining whether force used in making an arrest is excessive calls for a
18  fact-intensive inquiry requiring attention to all circumstances pertinent to the need for the force
19  used." Id. at 1024.  Both Isiah and Israel were suspects in the murder that had occurred the day
20  before on April 14, 2017.  That murder had involved the use of a handgun.  A survivor from the
21  crashed car expressly identified Israel as the shooter, stated that Isiah was present, and indicated
22  that the attack/shooting was gang related.  Although Isiah was not identified as the shooter, the
23  evidence could suggest that Isiah may be responsible for the murder under an aiding and abetting
24  theory.  See People v. Beeman, 35 Cal.3d 547, 560 (1984) (discussing aiding and abetting); Cal.
25  Crim. Jury Inst. 401 (elements for aiding and abetting).[5]  Further, the smoke shop video shows
26  Israel in possession of a handgun, Israel passing the handgun to Isiah, and Isiah then passing the

27
28  [5] The Court is not holding that Murrietta-Golding could have been lawfully arrested for murder under an aiding and
    abetting theory.  The Court is merely holding that the evidence suggests that this theory of murder was a possibility.

1   handgun back to Israel.  Thus, the video shows that both brothers had possession of and access to

2   a handgun at some point, even if the possession was limited in duration.  While the Court cannot

3   hold per *Velazquez* that some theory of murder was the crime at issue with respect to Isiah, the

4   Court cannot ignore Isiah's suspected participation in the murder and his possible access to a

5   handgun.[6]  While perhaps not falling strictly within the "crime at issue" factor, Isiah's suspected

6   participation in a murder and possible access to a firearm are facts that increase the possible

7   danger level associated with Isiah.  Those facts are relevant and must be considered under the

8   totality of the circumstances.

9                          b.    Threat Posed

10          The threat posed to the safety of the officers or others is the most important factor in

11   evaluating excessive force.  See Nehad, 929 F.3d at 1132; Mattos, 661 F.3d at 441.  The video

12   provides critical information about the shooting and the threat posed by Murrietta-Golding.  See

13   Scott v. Harris, 550 U.S. 372, 378-80 (2007); Longoria v. Pinal Cnty, 873 F.3d 699, 705-06 (9th

14   Cir. 2017); Booke v. County of Fresno, 98 F.Supp.3d 1103, 1119-20 (E.D. Cal. 2015).  The Court

15   has described the contents of the video above.  After review, the Court concludes that the video

16   can be reasonably interpreted in at least one of two ways.

17          First, the video can be interpreted as Murrietta-Golding making two distinct movements of

18   his left arm to his left hip and then up again, both times bending at the elbow, and in a motion that

19   is similar to drawing a handgun.  The first movement came as Murrietta-Golding looked over

20   towards Villalvazo and saw Villalvazo running towards him and the fence.  The combination of

21   Murrietta-Golding looking at Villalvazo and then raising his left arm in a drawing motion caused

22   Villalvazo to unholster his service weapon.  Murrietta-Golding ran four or five more steps and

23   then quickly moved his left arm in a drawing motion for a second time.  Murrietta-Godling did not

24   look at Villalvazo, but Murrietta-Golding's left arm is clearly reaching towards his left hip just

25   before Villalvazo fired.  Villalvazo's deposition testimony is not always clear, but Villalvazo did

26   testify that Murrietta-Golding raised his left arm in a drawing motion, and it was the second time

27

28   [6] There is far more that links Israel to the handgun.  Not only was he identified as the shooter, Israel also was the first brother seen with the gun, and Isiah only briefly handled the gun before giving it back to Israel.  Nevertheless, the video suggests that Isiah could at least gain access to the gun.

that Murrietta-Golding raised his left arm that Villalvazo fired.  See Villalvazo Depo. at 105:5-23. In other words, the video is supportive of Villalvazo's testimony that Villalvazo was reacting to two furtive or weapon-drawing movements by Murrietta-Golding's left arm.  Further, although there is no dispute that Murrietta-Golding was unarmed, Villalvazo's view of the situation was not identical to that daycare camera's view.  Villalvazo was behind and angled to Murrietta-Golding's right side.  It could be reasonably concluded from the video that Villalvazo could not see what Murrietta-Golding was doing with his left hand, he could only see the actions of the left arm that resembled a weapon-drawing motion.  Under this interpretation of the video, as well as the fact that Murrietta-Golding within the courtyard of a daycare center for children,[7] it could be reasonably concluded that Villalvazo was reacting to a reasonably perceived immediate threat to himself and possibly others from someone who was in headlong flight and a suspect in a murder in which a handgun was used the day before.

Second, the video could be interpreted as depicting Murrietta-Golding doing nothing but attempting to escape while keeping his baggy pants from falling down.  The video shows that Murrietta-Golding never displayed a weapon or any object that might be confused for a weapon, particularly a gun.  Murrietta-Golding's right hand was clearly holding his baseball cap from the moment that he flipped over the fence, regained his balance, and began to run, to the time that Villalvazo fired.  Murrietta-Golding's right hand had been the focus of Villalvazo's concern when Murrietta-Golding first started evading officers.[8]  As Murrietta-Golding was flipping over the fence, his red underwear was visible to a significant degree and his pants were in the process of falling down.  Once Murrietta-Golding landed and had grabbed his hat, he began to run.  As Murrietta-Golding was beginning to run, the video shows that his red underwear was still visible, his pants were quite baggy, and his pants were on the verge of falling down.  In order to run, the video indicates that Murrietta-Golding had to keep his pants from falling down.  Because his right

[7] It should be noted, however, that no children were visible, and it was a Saturday, which would seem to make it less likely that children or staff would be present.  Further, as Plaintiffs' experts point out, if Villalvazo had missed, it appears that his bullet would have struck the daycare center.

[8] There appears to be no dispute that Villalvazo lost sight of Murrietta-Golding for a period of time.  Without any indication of the time involved, the Court cannot say that Villalvazo's concern that Murrietta-Golding may have shifted a weapon from his right hip to his left hip is so unreasonable that it should be completely discounted.

hand was holding the baseball cap, Murrietta-Golding was using his left hand.  The video shows Murrietta-Golding grabbing his pants with his left arm at the left hip area in an attempt to pull the pants up and hold them in place.  As he begins running, Murrietta-Golding's pants appear to raise up a bit after the first upward motion of his left hand.  His left arm then lowered back down and stayed at his left hip area after the first upward motion for about two or three steps, indicating that Murrietta-Golding was attempting to keep ahold of his pants as he was running.  The second upward motion of the left arm then occurs at about the fourth or fifth running step and again is an upward motion that is consistent with Murrietta-Golding trying to raise up his pants to keep them from falling off.  The second motion with the left arm was very similar to the first motion, which did not result in any objects being drawn from the hip area or becoming visible.  Unlike the first arm motion, Murrietta-Golding did not look back at Villalvazo.  Murrietta-Golding never looked at Villalvazo or in Villalvazo's direction after Murrietta-Golding made the first motion with his left arm.  Murrietta-Golding's attention and gaze was focused on what was directly in front of him. Therefore, the video can be viewed as Murrietta-Golding trying to escape while trying to keep his baggy pants from falling off.  Additionally, although not pictured in the video, there is no dispute that Villalvazo partially observed Murrietta-Golding fleeing en route to the daycare.  Three third party witnesses also observed Murrietta-Golding running at that time.  Each of those witnesses indicated that Murrietta-Golding was running with one hand on his hip trying to hold up his baggy pants.  The statements of the third-party witnesses adds additional support to the interpretation that Murrietta-Golding was simply trying to escape while using his left hand to keep his pants from falling down.  Under this view, Murrietta-Golding did not present an immediate threat to Villalvazo or others.

There are at least two reasonable interpretations of the video.  Cf. Vos, 892 F.3d at 1028 ("The mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage.").  The Court is required to draw all reasonable inferences from the video in the Plaintiffs' favor.  Blankenhorn v. City of Orange, 485 F.3d 463, 468 n.1 (9th Cir. 2007).  Therefore, for purposes of this motion, the Court adopts the second interpretation of the video – Murrietta-Golding was trying to escape while using

1    his left hand to keep his baggy pants from falling down.  Under this interpretation, Murrietta-
2    Golding did not present an immediate threat to either Villalvazo or others when Villalvazo used
3    lethal force.

4         It is true that Villalvazo testified in his deposition that his view was not the same as the
5    video camera's view and that he did not notice Murrietta-Golding's red underwear, baggy pants,
6    or Murrietta-Golding holding up his baggy pants.  The Court recognizes that this testimony
7    undercuts the second interpretation of the video.  However, Villalvazo's testimony does not make
8    the second interpretation unreasonable.  The Court cannot say definitively from the video what
9    precisely Villalvazo could see and what he could not see from his angle.  The only things that the
10    Court can say is that Villalvazo's angle was not that of the daycare camera and that, because
11    Villalvazo's angle was back and to the right of Murrietta-Golding, it is likely that Villalvazo's
12    view of Murrietta-Golding's left side was imperfect or obscured to some degree.  However,
13    Murrietta-Golding's red underwear and baggy jeans are clearly visible on the video and it seems
14    likely that they would have been visible from most viewpoints behind Murrietta-Golding,
15    including Villalvazo's.[9]  Also, other third party witnesses believed that, prior to Murrietta-Golding
16    reaching the daycare fence, he was running while trying to hold up his pants with his right hand to
17    keep the pants from falling down.  It is not an unreasonable assumption that Murrietta-Golding
18    would have looked similar while running and trying to keep his pants from falling down, be it
19    while holding his pants at the right hip with his right hand or at the left hip with his left hand.  The
20    question then becomes, if third party witnesses could tell what Murrietta-Golding was doing, why
21    couldn't Villalvazo?  Given what third party witnesses observed moments before, as well as what
22    is depicted on the video, a reasonable jury could to choose to discredit Villalvazo's testimony.
23    That is, it will have to be for a jury to determine what aspects of the video Villalvazo was actually
24    able to observe in real-time and which aspects of the video he was unable to observe.

25         In essence, according to Villalvazo's testimony, his actions are based on a mistaken belief
26    that Murrietta-Golding was armed and trying to draw a gun from his pants when Villalvazo fired.

27

28    [9] Again, the Court cannot rely on the video to definitively say what Villalvazo could or could not see, including how
     apparent the red underwear, the baggy pants, and the baggy pants falling would have been to Villalvazo.

1  In reality, Murrietta-Golding was trying to keep his baggy pants from falling down.  The evidence

2  is such that a jury will have to determine whether Villalvazo's mistaken belief was reasonable.

3  See Nehad, 929 F.3d at 1133-34 (explaining that where an officer's use of force is based on a

4  mistake of fact, the question is whether a reasonable officer would have or should have accurately

5  perceived the fact and holding that whether the officer involved reasonably mistook a writing pen

6  for a knife was a triable question of fact).

7      For purposes of this motion, Murrietta-Golding did not present an immediate threat to

8  either Villalvazo or others when Villalvazo used lethal force.[10]

9          c.      Active Resistance/Evasion by Flight

10     Murrietta-Golding was not actively resisting Villalvazo at the time force was used.

11  However, Murrietta-Golding was clearly in the process of active evasion since he was running

12  from several police officers, scaled a fence, and kept running from officers once he was over the

13  fence.  It is safe to say that Murrietta-Golding was engaged in "headlong flight," which "is the

14  consummate act of evasion."   Illinois v. Wardlow, 528 U.S. 119, 124 (2000).

15          d.      Emotional or Mental Instability

16     No party has suggested that Murrietta-Golding suffered from any form of mental or

17  emotional instability.  Murrietta-Golding's actions do not suggest emotional or mental instability,

18  and no history of such conditions has been presented to the Court.  Therefore, this consideration is

19  irrelevant.

20          e.      Warning

21     No warning was given before Villalvazo fired his weapon.  The Court will accept for

22

23  [10] The Court notes that the parties argue about the significance of Villalvazo testifying that Murrietta-Golding posed
    an "imminent threat," as opposed to an "immediate threat."  In particular, the Plaintiffs note that the City's use of
24  force policy uses the term "immediate threat."  Ninth Circuit case law generally uses the term "immediate threat" in
    deadly force cases.  E.g. Nehad, 929 F.3d at 1132.  However, the Ninth Circuit has also held that "to justify deadly
25  force, an objective belief that an imminent threat of death or serious physical harm is required."  Price v. Sery, 513
    F.3d 962, 969 (9th Cir. 2008) (emphasis added).  Moreover, other circuit have held that deadly force may be used in
26  the face of "an imminent threat" of serious harm from a suspect.  E.g. Gysan v. Francisko, 965 F.3d 567, 570 (7th Cir.
    2020); Conlogue v. Hamilton, 906 F.3d 150, 156-57 (1st Cir. 2018) (using both "immediate threat" and "imminent
27  threat"); Woodcock v. City of Bowling Green, 679 F. App'x 419, 425 (6th Cir. 2017); Flythe v. District of Columbia,
    791 F.3d 13, 19 (D.C. Cir. 2015); Carr v. Tatangelo, 338 F.3d 1259, 1269 (11th Cir. 2003).  Case law therefore
28  indicates that there is not a material distinction between an "immediate threat" and an "imminent threat" for purposes
    of deadly force and the Fourth Amendment.

1   purposes of this consideration that Villalvazo yelled "stop police" as he was running towards the

2   fence.  However, that statement is a command to stop, it constitutes no warning whatsoever that

3   any amount of force will be used, let alone deadly force.  Nehad, 929 F.3d at 1137-38.  Therefore,

4   Villalvazo's command to stop is not a warning for purposes of an excessive force analysis.  See id.

5          That no warning was given does not end the matter.  The key is whether a warning could

6   have been feasibly given.  See Bryan, 630 F.3d at 831.  Villalvazo has testified that he drew his

7   weapon after Murrietta-Golding landed on the fence, looked over at Villalvazo, and made a

8   motion with his left hand towards his left hip (what Villalvazo describes as Murrietta-Golding

9   "target locking" on him).[11]   From that point, Murrietta-Golding never looked at Villalvazo again

10  and ran approximately five steps before Villalvazo fired his weapon.  It is unclear why Villalvazo

11  could not have given a warning that lethal force could be used as soon as Murrietta-Golding

12  "target locked."  This is because it was at the point of "target locking" that Villalvazo drew his

13  weapon and subjectively perceived a threat from Murrietta-Golding.  Yet, Murrietta-Golding

14  continued to run about five steps from the point in which Villalvazo drew his weapon.  Viewing

15  the evidence in the light most favorable to Plaintiffs as the non-moving party, the Court concludes

16  that a warning could have been feasibly given at a minimum Villalvazo testified that Murrietta-

17  Golding "target locked" on him.

18                      f.    Alternative Options

19         Initially, the Court notes that Plaintiffs do not actually identify another force option that

20  was available to Villalvazo.  It is clear that "hands on," pepper spray, and a baton were not options

21  given the fence and distance between Villalvazo and Murrietta-Golding.  Given the construction of

22  the fence (metal vertical bars) and the grassy daycare yard, a Taser might have been an option, but

23  there is no indication that Villalvazo had a Taser.  Therefore, the Court cannot conclude that

24  alternative force options were available.

25         What Plaintiffs do contend is that Villalvazo could have utilized different tactics, such as

26  letting the SRT apprehend Isiah using their "chase to contain" practice, or giving a warning to

27
28  [11] The Court realizes that there is a genuine dispute whether Murrietta-Golding's actions can reasonably be called
    "target locking."  The Court is not deciding this dispute.  The Court is merely using this term as a shorthand reference
    for a particular point in the encounter as described by Villalvazo.

                                              19

1    Murrietta-Golding in connection with the "target locking," or moving to the side and using the

2    cement wall as cover.[12]

3            With respect to issuing a warning, that consideration was already addressed above. The

4    Court has concluded that, viewing the evidence in the light most favorable to Plaintiffs, a warning

5    that lethal force would be used was feasible.

6            With respect to letting SRT employ their "chase to contain" practice, that may have been a

7    viable option. Sgt. Hoagland indicated that he was essentially exercising the "chase to contain"

8    tactic. However, it was the SRT team that was attempting a "chase to contain," and Villalvazo

9    was not a member of the SRT. There is no evidence that Villalvazo knew that the SRT was

10   implementing "chase to contain," and there is no evidence that Villalvazo even knew what "chase

11   to contain" was. In fact, Villalvazo testified that he did not believe that Hoagland's radio

12   transmissions were attempting to set up a perimeter and that setting up a perimeter would not be

13   normal practice because perimeters are generally established once an individual has stopped

14   running. See Villalvazo Depo. 88:6-89:1. Without additional evidence regarding Villalvazo's

15   understanding of "chase to contain," including whether he knew that the tactic was actually being

16   implemented, the Court cannot hold that it was a viable alternative to using force.

17           With respect to moving to the side behind the cement wall, Plaintiffs' expert John Ryan

18   suggests that this was an option open to Villalvazo. See Ryan Expert Report ¶ 250. The evidence

19   indicated that Murrietta-Golding was attempting to keep his pants from falling down, not

20   attempting to draw a firearm. Further, Murrietta-Golding was running. In order to fire a shot at

21   Villalvazo, Murrietta-Golding would have had to draw a gun from his left side, turn his body

22   around so that the gun would be in Villalvazo's direction, and then either stop running or keeping

23   running with his torso twisted in Villalvazo's direction. That is, Murrietta-Golding would have

24   had to do a number of significant and agile physical acts to be in a position to fire at Villalvazo.

25   In order to both make further observation of Murrietta-Golding and to address a possible threat

26   from a concealed firearm, Villalvazo could have quickly stepped to his right behind the cement

27

28   _____
     [12] This list is non-exhaustive. However, because the outcome of the motion will not change, the Court declines to
     address each additional alternative tactic suggested by Plaintiffs.

wall.  Moving to the wall would have provided cover and a safe location for additional

observation.  However, this option is very close to a retreat.  The Ninth Circuit does not impose

upon law enforcement officers a duty to retreat in the face of resistance or threat from a suspect.

See Reed v. Hoy, 909 F.2d 324, 330-31 (9th Cir. 1989); see also Salim v. Proulx, 93 F.3d 86, 92

n.3 (2d Cir. 1996) (observing that no case law clearly established that officers have a duty to

disengage in response to resistance to an arrest).  Nevertheless, viewing the totality of the evidence

in the light most favorable to Villalvazo, the Court concludes that a reasonable jury could find that

moving to the side of the fence was a viable option to Villalvazo.  But, as a matter of law, it was

not an action that he was required to take.  In other words, moving behind the cement wall can be

considered as an option open to Villalvazo, but his failure to do so does not alone mean that he

violated Murrietta-Golding's Fourth Amendment rights.

### g.    Relative Culpability

Plaintiffs' experts are critical of Villalvazo for injecting himself into the situation when the

team that he led was merely to provide surveillance, while the apprehension of Murrietta-Golding

(if necessary) was to be handled by the SRT.  If Villalvazo had kept his assignment and not

attempted to detain Murrietta-Golding, there is no reason to think that Villalvazo would have been

in the position that he was to use deadly force.[13]  On the other hand, it is undisputed that

Murrietta-Golding was on the verge of being safely and peacefully seized when he decided to flee.

If Murrietta-Golding had never fled, or had simply stopped (either voluntarily and unprompted or

in response to commands to stop) at any point before Villalvazo fired, there is no reason to think

that Villalvazo or any officer would have used lethal force against him.

### h.    Conclusion

Murrietta-Golding was suspected of participating in a murder and was running in headlong

flight away from numerous officers.  It seems likely that deadly force would not have been used if

Murrietta-Golding had stopped at any point prior to Villalvazo firing his weapon.  Nevertheless,

viewing the evidence in the light most favorable to Plaintiffs, the crimes for which an

---

[13] Plaintiffs suggest that Villalvazo may have created an exigent circumstance.  The Court cannot agree.  Villalvazo was one of a number of police officers pursuing Murrietta-Golding.  Villalvazo simply pursued Murrietta-Golding, told Murrietta-Golding to stop, and ran to the fence prior to firing his weapon.

1  arrest/detention were being made were non-violent misdemeanors, no warning was given by
2  Villalvazo that any force would be used even though it appears that a warning could have been
3  feasibly given, Villalvazo could have used the cement wall for cover and further observation, and,
4  critically, Murrietta-Golding was not an immediate threat to Villalvazo or others.  Under these
5  circumstances, a reasonable jury could find that Villalvazo's use of deadly force violated
6  Murrietta-Golding's Fourth Amendment rights.  Therefore, summary judgment on this claim is
7  inappropriate.

8

9  **II.     Qualified Immunity - Fourth Amendment Claims**

10          *Defendant's Argument*

11          Defendants argue that Villalvazo is entitled to qualified immunity for any Fourth
12  Amendment violation.   Clearly established law should not be defined at a high level of generality
13  but must be particularized to the facts of the case.  Plaintiffs cannot cite a single case in which an
14  officer in Villalvazo's situation has been found to have violated the constitution.  Although Isiah
15  was not actually reaching for a weapon, the Fourth Amendment does not require Villalvazo to be
16  omniscient.

17          *Plaintiffs' Opposition*

18          Plaintiffs argue that the facts viewed in their favor demonstrate that Murrietta-Golding did
19  not pose an immediate threat Villalvazo.  Plaintiffs cite at least eight cases that would have put
20  Villalvazo on notice that shooting Murrietta-Golding when he (Murrietta-Golding) had no weapon
21  and was not an immediate threat was unconstitutional.  Therefore, qualified immunity should be
22  denied.

23          *Legal Standard*

24          Qualified immunity applies when an official's conduct does not violate clearly established
25  statutory or constitutional rights of which a reasonable person would have known. White v. Pauly,
26  137 S. Ct. 548, 551 (2017).  Qualified immunity may apply regardless of whether the officer
27  makes a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.
28  Pearson v. Callahan, 555 U.S. 223, 231 (2009).  Officers are entitled to qualified immunity under

§ 1983 unless (1) the officers violate a federal a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." District of Columbia v. Wesby, 138 S.Ct. 577, 589 (2018); White, 137 S.Ct. at 551. "Clearly established" means that the statutory or constitutional question was "beyond debate," such that every reasonable official would understand that what he is doing is unlawful. See Wesby, 138 S.Ct. at 589; Vos, 892 F.3d at 1035. This is a "demanding standard" that protects "all but the plainly incompetent or those who knowingly violate the law." Wesby, 138 S.Ct. at 589 (citing Malley v. Briggs, 475 U.S. 335, 341 (1986)). To be "clearly established," a rule must be dictated by controlling authority or by a robust consensus of cases of persuasive authority. Id.; see also Perez v. City of Roseville, 882 F.3d 843, 856-57 (9th Cir. 2018) (noting that Ninth Circuit precedent is sufficient to meet the "clearly established" prong of qualified immunity). In examining whether a rule/right is clearly established, courts are to define the law to a "high degree of specificity," and not "at a high level of generality." Wesby, 138 S.Ct. at 590. The key question is "whether the violative nature of particular conduct is clearly established" in the specific context of the case. Vos, 892 F.3d at 1035 (quoting Mullenix v. Luna, 136 S.Ct. 305, 308 (2015)). Although it is not necessary to identify a case that it is "directly on point," generally the plaintiff needs to identify a case where an officer acting under similar circumstances was held to have violated a federal right. Wesby, 138 U.S. at 577; Vos, 892 F.3d at 1035; Felarca v. Birgeneau, 891 F.3d 809, 822 (9th Cir. 2018); Shafer v. City of Santa Barbara, 868 F.3d 1110, 1118 (9th Cir. 2017). Whether a constitutional right was violated is generally a question of fact for the jury, while whether a right was clearly established is a question of law for the judge. Morales v. Fry, 873 F.3d 817, 823 (9th Cir. 2017).

*Discussion*

The evidence viewed in the light most favorable to Plaintiffs is sufficient to support a Fourth Amendment violation. The question is whether the law was sufficiently clear in April 2017 that Villalvazo was violating Murrietta-Golding's constitutional rights by using deadly force. To answer this question, the Court must assume that Villalvazo "correctly perceived all of the relevant facts and ask whether an officer could have reasonably believed at the time that the force actually used was lawful under the circumstances." Nehad, 929 F.3d at 1140.

Viewing the evidence in the light most favorable to Plaintiffs, the facts are that Murrietta-Golding was arrestable for non-violent misdemeanor offenses (Penal Code § 148 and a misdemeanor parole violation), Villalvazo could have moved to his right behind the cement wall for cover and additional observation, no warning was given before lethal force was used although a warning was feasible, Murrietta-Golding was running with his back to Villalvazo and did not look back at Villalvazo a second time, Murrietta-Golding's underwear was visible and his pants looked baggy (i.e. it looked like his pants were falling down), and Murrietta-Golding was running while trying to hold his pants up with his left hand and thus, was not an immediate threat to Villalvazo or others.  Although Murrietta-Golding was in headlong flight, the law nevertheless was clearly established in 2017 that the use of deadly force in these circumstances was unconstitutional.  See Garner, 471 U.S. at 10-12; Torres v. City of Madera, 648 F.3d 1119, 1128 (9th Cir. 2011) ("[F]ew things in our case law are as clearly established as the principle that an officer may not 'seize an unarmed, nondangerous suspect by shooting him dead' in the absence of 'probable cause to believe that the [fleeing] suspect poses a threat of serious physical harm, either to the officer or to others.'" (quoting Garner, 471 U.S. at 11)).  Therefore, summary judgment with respect to the qualified immunity defense is inappropriate.[14]


## III.    Fourteenth Amendment – Familial Interference

*Defendants' Argument*

Defendants argue that Plaintiffs cannot show that Villalvazo acted with an ulterior motive or deliberate indifference when he fired the single shot at Isiah.  Villalvazo was one of several police officers pursuing Isiah, and Isiah had been recorded holding the handgun involved in a murder less than 24 hours prior.  Further, Villalvazo had no familiarity with Isiah prior to this incident.  The decision to fire was a split second decision made to protect Villalvazo and anyone in the daycare center or elsewhere who was in an imminent threat from a fleeing murder suspect.

---

[14] Given the nature of the dispute between the parties, including the different possible interpretations of the videotape, that qualified immunity has been denied does not mean that the defense cannot be pursued at trial.  See Johnson v. Bay Area Rapid Transit Dist., 724 F.3d 1159, 1168 (9th Cir. 2013); Glenn v. Washington Cnty., 673 F.3d 864, 870 n.7 (9th Cir. 2011); Wilkins v. City of Oakland, 350 F.3d 949, 955-56 (9th Cir. 2003); Santos, 287 F.3d at 855 n.12.

1

*Plaintiffs' Opposition*

2   Plaintiffs argue that the video shows evidence that shocks the conscience.  Villalvazo
3   injected himself into the pursuit in violation of an operation plan and then shot Isiah in violation of
4   the City's deadly force policy.  A reasonable jury could find that Villalvazo acted with a purpose
5   to harm when he chose to escalate the situation from what should have been a misdemeanor
6   detention to deadly force without warning, while ignoring safer alternatives, and when no other
7   officer saw the need to draw a gun.  A jury could also find that Villalvazo shot Isiah for the
8   improper purpose of stopping Isiah because Villalvazo could not climb the fence.  Thus,
9   Villalvazo intentionally used force beyond what was required by a legitimate law enforcement
10  objective.

11  Golding also argues that the video shocks the conscience based on the video being aired on
12  three major television networks, as well as going viral on other platforms.  Further, Villalvazo's
13  deposition testimony indicates that he believed that he could take matters into his own hands
14  because he had found Isiah guilty of murder.  That is, his motive was to rid Fresno of a what he
15  perceived to be a murdering gang member.

16  *Legal Standard*

17  The Ninth Circuit has recognized that parents have a Fourteenth Amendment liberty
18  interest in the companionship and society of their children.  Lam v. City of Los Banos, - - - F.3d -
19  - -., 2020 U.S. App. LEXIS 30638, *35 (9th Cir. 2020); Zion v. County of Orange, 874 F.3d 1072,
20  1076 (9th Cir. 2017).   A government officer violates this liberty interest if he engages in conduct
21  that shocks the conscience.  See Lam, 2020 U.S. App. LEXIS 30638 at *35; Zion, 874 F.3d at
22  1077; Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir. 2010).  The Fourteenth Amendment's
23  shocks the conscience standard is different from the Fourth Amendment's reasonableness
24  standard.  Lam, 2020 U.S. App. LEXIS at *35; Zion, 874 F.3d at 1077.  Conduct will shock the
25  conscience depending on whether the circumstances were such that actual deliberation by the
26  officer was practical.  Lam, 2020 U.S. App. LEXIS 30638 at *35; Wilkinson, 610 F.3d at 554.  If
27  deliberation is practical, the officer's conduct will shock the conscience if the conduct was done
28  with "deliberate indifference."  See A.D. v. California Highway Patrol, 712 F.3d 446, 453 (9th

Cir. 2013); Wilkinson, 610 F.3d at 554.  If deliberation is not practical, such as where an officer makes a snap judgment because of an escalating situation, the officer's conduct will shock the conscience if the officer acted with a purpose to harm that was unrelated to legitimate law enforcement objectives.  See A.D., 712 F.3d at 453; Wilkinson, 610 F.3d at 554.  The "purpose to harm" standard is a "heightened" standard and a subjective standard of culpability.  See Lam, 2020 U.S. App. LEXIS 30638 at *36; A.D., 712 F.3d at 453.  An officer may act with a legitimate purpose when his objective is self-defense, arrest, or protecting the public, but may act with an illegitimate purpose when his objective is to bully a suspect, "teach the suspect a lesson," or to get even.  See Lam, 2020 U.S. App. LEXIS 30638 at *36-*37; Nehad v. Browder, 929 F.3d 1125, 1139 (9th Cir. 2019).  "[A]lthough most purpose to harm cases will involve evidence of ulterior motive or bad intent separate and apart from evidence of an unreasonable use of force," some cases might involve a use of force that is "so grossly and unreasonably excessive that it alone could evidence a subjective purpose to harm."  Nehad, 929 F.3d at 1140.  The term "deliberation" is not to be interpreted in a narrow, literal, or technical sense.  See Wilkinson, 610 F.3d at 554.  If an officer is forced to act quickly because of an escalating situation or the evasive actions of a suspect, then it will be deemed that an insufficient period of time for deliberation existed and the heightened purpose to harm standard will apply.  See Lam, 2020 U.S. App. LEXIS 30638 at *36-*37; Wilkinson, 610 F.3d at 554.

*Discussion*

The Court must first determine whether Villalvazo was able to deliberate before using force.  The undisputed facts demonstrate that Murrietta-Golding was running and Villalvazo was trying to follow by car.  When Villalvazo stopped his car, Murrietta-Golding was at the daycare center's fence.  It appears that when Murrietta-Golding was flipping over the fence, Villalvazo was getting out of his car.  As discussed above, the video demonstrates that from the time that Murrietta-Golding's feet hit the daycare yard to the time that Villalvazo fired his weapon, four seconds elapsed.  Further, from the time that Murrietta-Golding first raised his left arm to the time that Villalvazo fired, about two seconds elapsed.  The two to four seconds is a short period of time and it involved a rapidly developing situation due to Murrietta-Golding's active evasion.  Under

1  Ninth Circuit precedent, there was an insufficient period of time for Villalvazo to deliberate.  See
2  Lam, 2020 U.S. App. LEXIS 30638 at *35-*38; Wilkinson, 610 F.3d at 554.  Because Villalvazo
3  did not have sufficient time to deliberate, Plaintiffs must show that Villalvazo acted with a
4  purpose to harm that was unrelated to a legitimate law enforcement objective.  See Lam, 2020
5  U.S. App. LEXIS 30638 at *36-*37; A.D., 712 F.3d at 453; Wilkinson, 610 F.3d at 554.

6       As discussed above, there are at least two interpretations of the video relating to the threat
7  posed by Murrietta-Golding.  Under the first view, Murrietta-Golding made two movements that
8  were consistent with a gun-draw, and it was known that Murrietta-Golding had recently had access
9  to a handgun and was present when the handgun was used to commit a murder.  That
10  interpretation of the videotape is directly contrary to a purpose to harm and would necessitate the
11  granting of summary judgment in favor of Villalvazo.  Under the second interpretation of the
12  video, Murrietta-Golding's baggy pants were clearly falling down, and he was simply running
13  away from Villalvazo while trying to keep his pants up.  Shooting an individual who poses no
14  immediate threat to an officer or others, who is being arrested for non-violent misdemeanors, and
15  who is simply running away while trying to keep his pants up is shocking.  Under this
16  interpretation of the video, a reasonable trier of fact could conclude that the use of force was "so
17  grossly and unreasonably excessive that it alone [does] evidence a subjective purpose to harm."
18  Nehad, 929 F.3d at 1140.

19       Because the Court views the evidence in the light most favorable to the non-moving party,
20  the Court again adopts the second interpretation for purposes of this motion.  Therefore, because
21  the video can be interpreted as demonstrating a level of force that fits within Nehad's theoretical
22  exception to the general rule in purpose to harm cases, summary judgment on this claim is
23  inappropriate.  Cf. id.

24

25  **IV.**   **State Law Claims**

26      *Parties' Argument*

27       Defendants argue that the state law claims are mirror images of the federal excessive force
28  claim.  Because that claim fails, the state law claims fail as well.

1    *Discussion*

2         Defendants' arguments are based on the invalidity of Plaintiffs' Fourth Amendment claim.

3    Because summary judgment is denied as to the Fourth Amendment claim, summary judgment on

4    the state law claims will also be denied.

5

6                                      **<u>ORDER</u>**

7         Accordingly, IT IS HEREBY ORDERED that Defendant's motion for summary judgment

8    (Doc. No. 48) is DENIED.

9

10   IT IS SO ORDERED.

11   Dated:   October 15, 2020

                                 SENIOR DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28